[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 3, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-10841

_____

D. C. Docket No. 04-00064-CR-LAC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL SHANE WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(October 3, 2006)**

Before MARCUS, WILSON and COX, Circuit Judges.

PER CURIAM:

Appellant Michael Shane Williams appeals the district court's denial of his

motion to suppress evidence. He also appeals his sentence, arguing that the district court improperly used enhancements in calculating his sentence under the Sentencing Guidelines. Upon review of the parties' arguments and the record, we find no reversible error, and therefore affirm.

## BACKGROUND

Williams entered a conditional plea to manufacturing methamphetamine in violation of 21 U.S.C. § 841, reserving the right to challenge the district court's denial of his motion to suppress evidence. The court sentenced Williams to 78 months' imprisonment and 3 years' supervised release.

The relevant facts are as follows. On December 5, 2003, Lewis Nicoletti, a child protection investigator with the Florida Department of Children and Family Services ("DCF") went to Williams' home to investigate a child endangerment tip. The anonymous caller said that the children at 6305 Toto Lane were not safe because the house was dirty, the children were neglected, and methamphetamine was used and manufactured there. Because of the allegations of illegal activity, Nicoletti did not want to go to the visit alone, and took two uniformed Santa Rosa County Deputy Sheriffs, Jamie Kahalley and Aaron Jasper. Nicoletti and Jasper knocked on the front door, but no one answered. Because Nicoletti heard people inside, he sent Kahalley to the back door to knock. Kahalley saw Williams and

2

signaled to Williams to open the front door, which he did.

Nicoletti identified himself to Williams, saying that he had a DCF report and asked to come inside. Williams allowed Nicoletti and the two officers inside. Williams called his wife into the room, who entered with two children. Nicoletti then read the report's allegations and provided a pamphlet explaining the DCF procedure to the couple. He explained that his contact with them was on a voluntary basis. After the couple answered his questions, Nicoletti asked to take a look around the house to make sure everything was okay, and Williams agreed. While looking through the house, Nicoletti noticed several refrigerators with their doors still attached on the screened back porch which he noted as a safety hazard. Nicoletti also noticed a cooking pot on the ground. When he bent over the pot, Nicoletti smelled a strong odor, which he associated from his previous law enforcement experience with the manufacture of methamphetamine.

Nicoletti told Kahalley what he found and asked him to take a look. Kahalley then moved from beside Williams to the back porch to see the pot. Upon entering the porch, Kahalley noticed the chemical odor. When he examined the pot, which was under a mounted air conditioner unit, he could see through a crack around the unit into a hidden room. In the room, he saw items indicating a methamphetamine lab, a bulletproof vest, and firearms. Upon reentering the

house, Kahalley asked Williams if he was in law enforcement. Because Williams said "no," he was placed in handcuffs for safety. When Kahalley told Williams what he had observed, Williams, after some hesitation, agreed to show the room to the officers. Once confirming it contained a possibly active methamphetamine lab, officers called the narcotics unit.

Williams and his family were removed from the house when the narcotics unit arrived. He was placed in the back of a patrol car because it was cold outside and to keep him secure. A newly arrived officer, Lt. Robert Floyd, approached Williams and said that he knew that Williams had refused to consent to a search, but that he intended to apply for a search warrant. Lt. Floyd made sure Williams understood he was not under arrest. Williams asked to speak to his wife, and after a conversation with her, he consented to the search. Lt. Floyd had Williams sign a consent to search form. During the search, the officers seized six firearms. Williams was arrested and read his Miranda rights, which he waived. He then admitted to owning the firearms and manufacturing methamphetamine.

Two months later, on February 22, 2004, Milton patrol officer Gino Catalfu was dispatched to a Food World to investigate a retail theft. The manager of a nearby K-Mart approached Catalfu in the parking lot complaining that a white male was acting suspiciously and hanging around the medicine aisles in his store.

4

The manager told Catalfu that the man purchased some pseudoephedrine before meeting another man in the parking lot, and that the two went into Food World.

Catalfu went into Food World and located the man in the medicine aisle. The man, later identified as Terry Goddard, stated that his friend Michael was somewhere else in the store. Officer Riley, who had arrived as back-up, found Michael Shane Williams in the bathroom stuffing books of matches that he intended to steal into the front of his pants.

After Williams was detained, Catalfu requested that a K-9 officer be sent to the parking lot. The dog performed a sniff test and gave a positive alert to Williams' vehicle. Catalfu searched the vehicle and found a gallon jug of acetone and 576 pseudoephedrine pills. After Miranda warnings, Williams stated that he intended to use the items to manufacture methamphetamine. When asked if he had similar items at his home, Williams said yes but also stated that he did not want officers to search his home.

Williams was indicted on June 15, 2004, and a plea was accepted on July 28, 2004. Williams later withdrew his plea and filed a motion to suppress evidence from the December 5, 2003 search of his house and the February 22, 2004 search of his automobile and home. The district court held a hearing on the motion, after which it denied the motion. The court found that (1) Nicoletti was properly in the

house to investigate child abuse allegations, (2) the presence of law enforcement was reasonable given the allegations, (3) Williams gave consent to search, (4) arrest was proper after the finding of the drug lab, and (5) Williams waived his rights and made a statement to police. Regarding the February search, the court found that (1) the canine alert led to the search, (2) it was reasonable for the police to act on a "hunch" and go to Williams' house given the prior knowledge of the house, and (3) Mrs. Williams gave consent to the search of the Williams' house.

After the denial of his motion to suppress, Williams entered a conditional plea. The presentence investigation report ("PSI") recommended a two-level increase because the offense included possession of a firearm, and a six-level increase for the substantial risk to the life of minor children. It also included a three-level reduction for acceptance of responsibility. The total offense level of 29 with a criminal history category of I resulted in Guideline range of 87 to 108 months imprisonment.

Williams objected to the amount of drugs, firearm enhancement, and the substantial risk to minor enhancement. He also objected under *United States v. Booker,* 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 621 (2005). The government conceded that the PSI amount included unusable portions and the court accepted the lower amount, amending the guideline range to 70 to 87 months. The court

overruled the objections as to the enhancements based on the testimony that both minors and firearms were found in the house. The court overruled the *Booker* objection noting that the Sentencing Guidelines were advisory. The court then sentenced Williams.

## STANDARD OF REVIEW

We review the denial of a motion to suppress under a mixed standard, "reviewing the district court's findings of fact for clear error and its application of law to those facts *de novo*." *United States v. Lyons*, 403 F.3d 1248, 1250 (11th Cir. 2005). All facts are construed in the light most favorable to the prevailing party below. *United States v. Boyce*, 351 F.3d 1102, 1105 (11th Cir. 2003). Because Williams objected at trial to the use of sentencing enhancements under *Booker*, we review *de novo* the district court's interpretation of the Sentencing Guidelines and the ultimate sentence for reasonableness. *United States v. Williams*, 435 F.3d 1350, 1353 (11th Cir. 2006) (per curiam).

## DISCUSSION

On appeal, Williams argues that his Fourth Amendment rights were violated by the December search of his home and the February search of his car. The Fourth Amendment protects people from unreasonable search and seizures by the government absent probable cause. *United States v. Dunn,* 345 F.3d 1285, 1288

7

(11th Cir. 2003). However the *Terry* exception allows officers to make minimally intrusive searches when there is "an objectively reasonable suspicion that 'criminal activity may be afoot.'" *Dunn,* 345 F.3d at 1289 (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884, 20 L. Ed. 2d 889 (1968)). This less demanding standard "is determined from the totality of circumstances and collective knowledge of the officers." *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (per curiam).

December Search

Williams argues that the December search of his home was unreasonable because the DCF worker's search went beyond that scope of his authority and any consent given by Williams was in mere acquiescence to the DCF worker's apparent authority. The government contends that consent to the search was voluntary.

A warrantless search can be conducted in the absence of probable cause or reasonable suspicion when voluntary consent is obtained. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). A determination that consent was voluntary is a finding of fact, which we disturb only if clearly erroneous. *United States v. Zapata*, 180 F.3d 1237, 1240-41 (11th Cir. 1999). "The government bears the burden of proving both the existence of

8

consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). In evaluating whether consent is voluntary, the court considers a number of factors "including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001).

When a general consent is given without limitations, the search "is constrained by the bounds of reasonableness." *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990). To determine the bounds of reasonableness, "we must consider what the parties knew to be the object (or objects) of the search." *Zapata*, 180 F.3d at 1243.

Although some facts point to the conclusion that consent was not completely voluntary, we cannot say that the district court clearly erred in its finding because the totality of circumstances support its inference. Williams allowed Nicoletti with two uniformed police officers into his home. Williams knew the purpose of the visit was to investigate child endangerment allegations that a drug lab was in the

9

house and that the couple's participation was voluntary, but still agreed to let Nicoletti look around his home. After Nicoletti discovered the cook pot, he invited the officer to take a look in Williams' presence, and Williams did not object. Although Williams' ultimately signed the consent form while handcuffed in the back of a police car, this was evidently done because it was cold and, given the firearms observed on the premises, necessary to ensure officer safety. Furthermore, Williams was assured that he was not under arrest and the officers granted his request to speak to his wife. Given these circumstances, we can find no clear error.

The search was also within the bounds of reasonableness. Williams was aware that the visit was prompted by an allegation of a drug lab on the premises endangering his children. A reasonable person would recognize that his consent to search the house would extend to areas where his children had access. Nicoletti found the evidence of the drug lab on the back porch, an area that was accessible to the children. Further, the presence of the two uniformed officers makes it unreasonable to believe that evidence of illegal drugs would not be passed on to law enforcement. Because consent to the search was voluntary and the search itself was reasonable, we find no reason to disturb the district court decision as to the December search.

February Search

Williams argues that the district court erred by allowing evidence obtained during the search of his automobile because law enforcement lacked probable cause or reasonable suspicion to conduct the search. The government responds that probable cause to search the automobile arose once a trained canine gave a positive alert.

A canine sniff during a lawful detention does not constitute a search. *Illinois v. Caballes*, 543 U.S. 405, 408-09, 125 S.Ct. 834, 837-38, 160 L. Ed. 2d 842 (2005). Once a trained canine gives a positive alert to a vehicle, probable cause exists to make the search that vehicle. *See United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998). Under the automobile exception, the police can make warrantless searches of an automobile that is readily movable where probable cause exists to believe that the vehicle contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940,116 S. Ct. 2485, 2487, 135 L. Ed. 2d 1031 (1996) (per curiam).

The police officers relied on their collective knowledge of Williams' criminal history, witness reports of his companion lingering in medicine aisles at K-Mart, his companion's reaction to the officer's approach, and Williams' evasive behavior in the restroom. This knowledge gave rise to a reasonable suspicion that

criminal activity was afoot and led to a lawful detention. During this lawful detention, the canine sniff occurred and the canine's alert reaction gave probable cause to search Williams' vehicle. Thus, we can find no error in the trial judge's ruling on the motion to suppress the evidence from the automobile search.

Sentencing

Williams also challenges the district court's use of two sentencing enhancements in calculating his Sentencing Guideline range. He argues that these were not charged in the indictment and not proved beyond a reasonable doubt in violation of *Booker*. We find no merit to this argument.

Post-*Booker*, the sentencing court remains obligated to calculate the Sentencing Guideline range including any enhancements. *Williams*, 435 F.3d at 1353. When the district court treats the Guidelines as advisory, nothing in *Booker* prohibits the district court from making additional factual findings under the preponderance of the evidence standard. *United States v. Chau*, 426 F.3d 1318, 1323-24 (11th Cir.2005) (per curiam). Here the court correctly calculated the Guidelines sentence and recognized that it was advisory. There is no indication that the sentence was unreasonable. Accordingly, we find no error in the district court's sentencing.

CONCLUSION

We can find no error in the district court's denial of the motion to suppress. Furthermore, the district court properly sentenced Williams. Therefore his conviction and sentence are affirmed.

**AFFIRM.**