*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ARCHIE SOVA,

Defendant-Appellant.

UNPUBLISHED
April 10, 2026
10:58 AM

No. 375595
Ingham Circuit Court
LC No. 25-000105-FH

Before: GADOLA, C.J., and BOONSTRA and PATEL, JJ.

BOONSTRA, J. (*concurring in part and dissenting in part*).

I agree with the majority that defendant was seized for purposes of the Fourth Amendment and that Deputy Pintar was justified in seizing defendant to address a possible traffic violation. I disagree, however, with the majority's conclusion that Deputy Pintar violated defendant's Fourth Amendment rights such that the methamphetamine recovered from defendant's vehicle should have been suppressed. Therefore, I concur in part and dissent in part.

In my judgment, the majority makes two critical errors. First, the majority incorrectly presumes that the dog sniff prolonged the seizure. It did not. Second, while acknowledging the totality of the circumstances test for assessing reasonable suspicion, the majority effectively employs the opposite principle, dissecting individual circumstances to find each insufficient. For each of those independent reasons, I conclude that the trial court did not err when it denied defendant's motion to suppress. I would therefore affirm.

The majority correctly recognizes that a dog sniff only "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the [traffic] violation." *Rodriguez v United States*, 575 US 348, 350; 135 S Ct 1609; 191 L Ed 2d 492 (2015) (cleaned up). "The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop." *Id.* at 357 (cleaned up).

In this case, the dog sniff did not prolong the stop. Respectfully, the majority does not paint an accurate picture when it describes what it calls an "approximately 14-minute wait for the canine unit," when it asserts that once the canine unit was requested "the detention became focused

on defendant's potential possession of illegal drugs," when it describes the stop after that point as a "drug investigation" and a "detour from the mission of the stop," and when it contends that "Deputy Pintar did not take any steps toward writing a citation, calling for a tow, or anything else to have accomplished the mission of the stop."

The body-cam video tells a far different story. It was at the 1:12 mark of the video that Deputy Pintar and his partner first made contact with defendant, after pulling into the parking lot in which defendant was standing in the rain outside of his open vehicle. Deputy Pintar's initial inquiries to defendant ("How we doing, sir?" and "What's going on?") were met with erratic behavior, unresponsiveness, incoherent speech,[1] and repeated efforts to reach into or toward his open vehicle, all of which elicited a request from Deputy Pintar ("can you keep your hand out of your pocket?") and repeated directives to "keep your hand out of the car."

At the 2:40 mark of the video, defendant provided Deputy Pintar with his driver's license. At the 2:45 mark, Deputy Pintar told his partner, "It's Archie." Deputy Pintar later testified that defendant "had an established history of possession of a stolen vehicle as well as possession of methamphetamine." And he testified that "[o]nce I observed his driver's license and saw who he was and the name, that's when everything kind of came together of the past history and everything else." Deputy Pintar then explained to his partner what had occurred up to that point in time, called for a canine unit at the 3:15 mark of the video, and returned to his vehicle to initiate a check of defendant's license, registration, and insurance.

Far from focusing thereafter on a "drug investigation," Deputy Pintar spent the next several minutes assessing the condition the vehicle and endeavoring to communicate with defendant about various issues relating to the stop itself, including the vehicle's condition, the damaged front end, the lack of working headlights, the shattered windshield, the rainy driving conditions, whether defendant owned the vehicle, how far defendant needed to drive, whether defendant had insurance on the vehicle (inasmuch as the Secretary of State's office indicated that there was no insurance), and the fact that the vehicle was not safe to drive. Given's defendant's communication difficulties, the process for exploring these issues was cumbersome to say the least.

At the 10:30 mark of the video, defendant indicated that he had insurance through State Farm. Following unsuccessful inquiries about his purchase of the vehicle and how far he had to drive, defendant finally indicated at the 13:41 mark that he was driving to Lansing.[2] At the 13:50 mark, defendant acknowledged that he had pulled into the parking lot because he could not see the roadway. At the 14:45 mark, defendant indicated that his destination was Holt, not Lansing. He was unable to identify the street of that location, but did indicate the direction he would take to get there. At the 15:27 mark, defendant indicated that he had bought the vehicle only one week earlier. At the 15:43 mark, defendant said that he was currently living in Mason, and at the 16:15 mark, he confirmed that the address on his driver's license was his current address in Mason. At the 16:27 mark, defendant indicated that he understood Deputy Pintar's concerns about defendant

_____

[1] At the 2:39 mark of the video, defendant was able to utter the word "stroke," a circumstance that may explain, at least in part, defendant's communication difficulties.

[2] The stop occurred in Holt.

driving his vehicle, especially given its condition and the rainy and freezing conditions. At the 16:53 mark, defendant stated that he would have to drive 10 miles to get to his destination.

By that point in time, the canine had arrived and alerted on defendant's vehicle.[3] Respectfully, the intervening circumstances did not reflect a "drug investigation," a "detour from the mission of the stop," a "focus[] on defendant's potential possession of illegal drugs," or a "14-minute wait for the canine unit." Nor, in my view, is it fair or accurate to say that "Deputy Pintar did not take any steps toward writing a citation, calling for a tow, or anything else to have accomplished the mission of the stop." The mission of the stop was to address the dangers attendant to defendant's driving of an undrivable vehicle in undrivable conditions, and to ensure the safety of all concerned. And Deputy Pintar was focused on safety, beginning with ascertaining basic information about the driver, the vehicle, the desired destination, the registered and insured status of the vehicle, and assessing the situation given the undrivable condition of the vehicle and the weather conditions at that time. There was nothing about Deputy Pintar's conduct that was suggestive of any "delay" or "detour." To the contrary, his investigation was at all times polite, appropriate, respectful, and focused on ensuring the safety both of defendant and of other drivers and pedestrians who might be placed in harm's way if defendant were allowed back behind the wheel. The duration of the entire encounter was reasonable and appropriate, particularly given the circumstances of defendant's basic communication difficulties.

Simply put, the dog sniff did not delay the stop. For that reason alone, there was no Fourth Amendment violation. *Rodriguez*, 575 US at 350, 357.

We thus need not even reach the "reasonable suspicion" question. The majority agrees that Deputy Pintar had a proper basis for the stop itself. Deputy Pintar did not prolong the stop beyond the time reasonably required to complete the mission under the circumstances he then encountered. And when the dog alerted on defendant's vehicle while Deputy Pintar was addressing the safety issues before him, it provided the reasonable suspicion required to then search defendant's vehicle (at which point methamphetamine was recovered from the vehicle).

No other "reasonable suspicion" was required. What the majority seems to take issue with is not the supposed prolongation of the stop (because that did not occur), but rather the fact that Deputy Pintar called for a canine unit at all and the fact that he did so at least in part because he was aware of defendant's past history involving methamphetamine. But this misses the point because calling for a canine unit does not itself require reasonable suspicion. See *Illinois v Caballes*, 543 US 405, 410; 125 S Ct 834; 160 L Ed 2d 842 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment."); *People v Williams*, 472 Mich 308, 318 n 16; 696 NW2d 636 (2005) (citing *Caballes* for the proposition that "as long as the traffic stop is not prolonged, an officer may use a drug-detection dog to sniff a

---

[3] As noted, the elapsed time between Deputy Pintar first making contact with defendant and the canine unit's arrival was no more than 15 minutes 41 seconds (from the 1:12 mark to the 16:53 mark of the video) and the time elapsed between calling for the canine unit (at the 3:15 mark of the video) and the canine hitting on defendant's vehicle (at or before the 16:53 mark) was about 13 minutes and 38 seconds.

vehicle during the stop, even if the defendant does not consent and the officer lacks reasonable, articulable suspicion that the occupants of the vehicle are involved with narcotics"). Rather, as the majority acknowledges, "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff prolongs—i.e., adds time to— the stop." *Rodriguez*, 575 US at 357 (cleaned up), which, as noted, it did not.

And in any event, there was a combination of circumstances that led Deputy Pintar to call for the canine unit. Upon encountering defendant, Deputy Pintar was met with erratic behavior, unresponsiveness, incoherent speech, and repeated efforts to reach into or toward his open vehicle. Then, upon learning defendant's identity, "that's when everything kind of came together of the past history and everything else." As our Supreme Court has recognized, "individual factors that would be insufficient on their own . . . can, in the aggregate, provide reasonable suspicion under the totality of the circumstances." *People v Prude*, 513 Mich 377, 392; 15 NW3d 249 (2024). Courts do not consider each individual fact and circumstance in a vacuum; rather, whether an officer has a reasonable suspicion is determined "on the basis of an analysis of the totality of the facts and circumstances." *People v Jenkins*, 472 Mich 26, 32; 691 NW2d 759 (2005). Further, a defendant's "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id*. at 34 n 7 (quotation marks and citation omitted). Under the totality of the circumstances in this case, even if reasonable suspicion were required (which it was not), it existed here.

For all of these reasons, I would affirm the denial of defendant's motion to suppress.

/s/ Mark T. Boonstra