# IN THE COURT OF APPEALS OF IOWA

No. 17-1025
Filed July 5, 2018

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**PEDRO IBARRA MURILLO JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Paul R. Huscher (suppression) and Randy V. Hefner (trial and sentencing), Judges.

        The defendant appeals from the denial of his motion to suppress.
**AFFIRMED.**

        Mark C. Smith, State Appellate Defender, and Nan Jennisch, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

        Heard by Vaitheswaran, P.J., and Potterfield and Tabor, JJ.

**POTTERFIELD, Judge.**

Pedro Ibarra Murillo Jr. appeals from the denial of his motion to suppress. He maintains his constitutional rights were violated when police officers detained him without reasonable suspicion to prolong the stop after arresting the passenger of his vehicle. He asks that we reverse the denial of his motion and suppress all evidence obtained from his vehicle.

**I. Background Facts and Proceedings.**

On the afternoon of September 30, 2016, Deputy Sheriff Adam Jacobs was getting into his patrol car when he noticed a truck pulling a trailer as it drove by him. He recognized the man sitting in the passenger seat as Michael Feller, whom the deputy knew had an outstanding warrant for arrest. The officer followed the truck for a number of miles before initiating a stop of the vehicle. After the driver—Murillo—pulled over, Deputy Jacobs approached the passenger side of the truck. As he got near, Jacobs noticed that Feller had reclined his seat and was laying down in the truck; a manner in which he had not been seated before the officer initiated the stop. Jacobs instructed Murillo to roll down the window or unlock the doors of the vehicle so he could extract Feller from the truck, but Murillo refused to do so. The officer advised Murillo that he had stopped the vehicle because he had a warrant for the arrest of his passenger, but Murillo still refused to comply. After the officer radioed for a second unit and withdrew his service weapon, Murillo unlocked the doors. Feller then exited the vehicle. Deputy Jacobs patted down Feller, finding a knife and small bag of methamphetamine[1] in Feller's pocket.

---

[1] Jacobs testified he recognized the substance as methamphetamine at the time he found it based on his training; later testing of the substance confirmed his identification.

Jacobs handcuffed Feller and put him in the back of his squad car. According to the call-for-service-detail report created and kept by the police department, this occurred at 17:00 hours or 5:00 p.m.

After Feller had been detained, Jacobs returned to Murillo's vehicle to speak with him, asking Murillo for his license, registration, and proof of insurance. "Unprompted," Murillo told Deputy Jacobs that he did not want the officer to search his vehicle. Additionally, he reported he did not have his registration card or current insurance information with him. Jacobs noted that Murillo had not checked the center console for the documents and asked him if he intended to do so; Murillo responded that it was locked. At that point, at 5:11 p.m., Deputy Jacobs called for a K-9 unit.

Deputy Behnken and the drug-sniffing dog, Kaia, arrived at the scene at 5:26 p.m. Within a few minutes, Deputy Behnken took Kaia around the vehicle; she "indicated" by sitting near the rear passenger door.

Deputy Jacobs and Deputy Behnken then decided to conduct a search of the interior of the vehicle. They were initially unable to begin the search, as Murillo had intentionally locked the keys in the vehicle when he was asked to step out so the dog sniff could be conducted. The officers used a tool to gain entry into the vehicle. Once inside, the officers used the ignition key for the vehicle to open the locked center console. The search uncovered:

> a loaded Sig P238 with a leather holster located in the center console, along with a plastic bag full of U.S. currency, a couple glass pipes with green leafy plant substance, . . . believe[d] to be marijuana, a tear dropper full of brown liquid, . . . believe[d] to be THC oil, and a large amount of U.S. currency in the back seat of the pickup truck.

According to the complaint and affidavit filed by Deputy Jacobs, the officers also found "a clear plastic baggie containing an amount of a crystal like substance . . . on the driver's side floor board," which field tested positive for methamphetamine.

Deputy Jacobs then placed Murillo under arrest. Murillo was charged with possession of a firearm by a felon, possession of a controlled substance (methamphetamine), and possession of a controlled substance (marijuana).

Murillo filed a motion to suppress, arguing he had been seized when he was detained so the officers could call for and complete a dog sniff of his vehicle without officers having the requisite level of suspicion. Murillo later filed an amended motion, in which he argued—under the recently decided *State v. Coleman*, 890 N.W.2d 284, 301 (Iowa 2017)—that the purpose of the stop was resolved once the officer detained Feller, so the officer could not then extend the traffic stop by returning to the vehicle and asking Murillo for his license and registration.

At the suppression hearing, Deputy Jacobs testified that at the time he initiated the stop, he was personally aware of Feller's history of involvement with illegal drugs, as he had previously been involved in a high-speed chase with Feller that ultimately resulted in the recovery of a half pound of marijuana and some amount of methamphetamine from Feller's vehicle. Additionally, the deputy knew the current arrest warrant for Feller's arrest stemmed from Feller's violation of that probation. Additionally, Jacobs testified he had "been provided information from several sources that Mr. Murillo was involved in the sale and trade of illegal narcotics and that he was currently—that Mr. Feller was an associate of his and that Mr. Feller was hiding out at his farm residence." Jacobs also claimed his unnamed sources told him, "Murillo was known to carry weapons," and that

Murillo's vehicle—the truck and trailer that Jacobs pulled over—"match[ed] the description" of the vehicle his contacts told him Feller was using "while he was on the run." He conceded this information was more than two weeks old at the time of the traffic stop.

In the written ruling, the court noted the State asserted "reasonable suspicion to prolong the stop and to perform a drug dog sniff" "arose from [Murillo's] actions, including refusing to unlock the doors for officers, locking his own keys inside the vehicle, and stating that he would not give consent to a search prior to officers asking for a search." The court rejected a number of the officer's reasons justifying the stop, including his claims that he was unable to read the license plate on the trailer, that Murillo and Feller had said there was a death in the family that required them to go to Denison yet they were not on the most direct route, and that "several sources" had previously told him Murillo was known to carry a weapon and to be involved in drug activity. Yet the court denied Murillo's motion to suppress, ruling the deputies had reasonable suspicion at the time Feller was arrested to extend the stop of Murillo. In reaching its decision, the court relied on the following:

> Upon stopping the vehicle, it was Murillo who refused to open a window or door until the officer pulled his weapon. Upon removing Feller from the pickup, and finding controlled substances on his person, the request that the driver produce the registration and proof of insurance was not impermissible. Murillo's response that he wouldn't look in the console because it was locked, his statement regarding refusing a search when none was requested, and his failure to produce documents required to be maintained in the vehicle provided a sufficient basis for his further detention.
> . . . .
> The court finds [Murillo's] suspicious behavior, his association with Feller, and the presence of drugs on Feller, provide enough, reasonable suspicion for a dog sniff.

Following the denial of his motion to suppress, Murillo waived his right to a jury trial, and the case proceeded to a bench trial on the stipulated minutes of evidence. The court found Murillo guilty as charged as to each of the three counts. Murillo was later sentenced to a term of incarceration not to exceed five years. Murillo appeals.

## II. Standard of Review.

"We review the district court's denial of a motion to suppress on constitutional grounds de novo." *Coleman*, 890 N.W.2d at 286. "This review requires 'an independent evaluation of the totality of the circumstances as shown by the entire record.'" *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011) (quoting *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001)). We give deference to the fact findings of the district court "due to its opportunity to evaluate the credibility of the witnesses," but we are not bound by the findings. *Id.* (citation omitted).

## III. Discussion.

Pursuant to *Coleman*, a law enforcement officer making a valid traffic stop supported by reasonable suspicion must terminate the stop when the underlying reason for the stop has been resolved and there is no other basis for reasonable suspicion. 890 N.W.2d at 301. As the district court found, the underlying reason for the stop was to arrest Feller.[2] It is undisputed this was completed before the officer turned his attention to Murillo. Thus, the initial question before us is whether

---

[2] At the suppression hearing, Deputy Jacobs testified that he was unable to see Murillo's rear license plate on the trailer while he was following the vehicle, suggesting another basis for the stop. However, the trial court found this claim lacked merit, as the video from Jacob's police car—which was admitted as an exhibit—showed otherwise. The State has not renewed this argument on appeal.

Deputy Jacobs had some other basis for reasonable suspicion to extend the stop at the time he returned to Murillo's vehicle and asked him for his license, registration, and proof of insurance.

In Iowa, "[w]e strongly favor the warrant requirement, subject only to 'jealously and carefully drawn exceptions.'" *Id.* at 286 (quoting *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992)). "One of the well-established exceptions to the warrant requirement is that formulated in *Terry v. Ohio*, which allows an officer to stop an individual or vehicle for investigatory purposes based on a reasonable suspicion, supported by specific and articulable facts, that a criminal act has occurred or is occurring." *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). Here, the State maintains the officer could extend the stop and expand the scope to Murillo because "Deputy Jacobs discovered facts that gave rise to a reasonable suspicion that Murillo was either committing or concealing evidence of a crime" before Feller was detained. Specifically, the State maintains Murillo's refusal to unlock or open the doors to allow the officer to extract Feller from the vehicle; the fact that drugs were found on Feller, as well as Murillo's association with the known drug dealer; and the information Deputy Jacobs had previously learned about Murillo from "tips" or "sources" was enough to give rise to reasonable suspicion. It is the State's burden to prove by a preponderance of the evidence that the officer had the requisite level of suspicion necessary to continue the stop. *See State v. Tyler*, 830 N.W.2d 288, 293 (Iowa 2013). "The existence of a reasonable suspicion is based on an objective standard: whether the facts available to the officer at the time of the stop would lead a reasonable person to believe that the action taken by the officer was

appropriate." *Kinkead*, 570 N.W.2d at 100. "If the State fails to carry its burden, the evidence obtained through the investigatory stop must be suppressed." *Id.*

In determining whether the basis for reasonable suspicion existed, "we do not evaluate . . . based on each circumstance individually, but determine the existence of reasonable suspicion by considering all the circumstances together." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). Like the district court, we find the officer's testimony that he had received uncorroborated tips from unnamed sources weeks before about Murillo carrying a weapon and being engaged in the narcotics trade to be without value for the purpose of providing reasonable suspicion. "An anonymous tip, alone, does not ordinarily contain sufficient indicia of reliability to provide reasonable suspicion, let alone probable cause." *See State v. Kern*, 831 N.W.2d 149, 175 (Iowa 2013). Additionally, while we take into account the fact that the officer found drugs on Feller's person, we find this fact of limited value when considering whether it provides reasonable suspicion since, in his testimony, Deputy Jacobs agreed he had not seen or smelled evidence of illegal drugs in the vehicle when he detained Feller; the officer also did not provide testimony of any behavior from Murillo that indicated he was under the influence of narcotics. *Cf. State v. Predka*, 555 N.W.2d 202, 207 (Iowa 1996) (finding probable cause to search a vehicle based on the odor of marijuana emanating from the vehicle, the driver's "nervous state and heavy breathing," and the officer's observation of plastic bags in the car"). That being said, we recognize that a suspect's association with a known drug dealer is a relevant consideration in determining whether reasonable suspicion exists. *See State v. Dougherty*, No. 09-0812, 2011 WL 441551, at *9 (citing *State v. Bergmann*, 633 N.W.2d 328, 333

(Iowa 2001) (finding reasonable suspicion to conduct a search when the suspect "was spotted in a known drug area alongside a nefarious drug dealer," when the drug dealer retreated once he saw the police and the suspect then drove away quickly, and when the officers recognized the suspect from a past weapon and drug arrest and the suspect lied to the officer and acted nervous)).  The State maintains that Murillo's initial refusal to unlock the doors of his vehicle "raised a strong inference" that "Murillo believed that evidence that would be discovered if Feller were arrested would also implicate Murillo."  The State argues Murillo's avoidant behavior "can be used to establish reasonable suspicion."  *See, e.g.*, *State v. Wilson*, 878 N.W.2d 203, 211, 213 (Iowa 2016) ("It is well-settled law that the act of avoiding law enforcement after a crime has been committed may constitute circumstantial evidence of consciousness of guilt that is probative of guilt itself. . . .   [T]he probative value of evidence showing a defendant avoided apprehension turns on the circumstances under which the avoidance occurred.").  Additionally, Murillo's refusal to unlock the doors of the vehicle after he was advised that Deputy Jacobs had a warrant for Feller's arrest provided Deputy Jacobs with probable cause Murillo had interfered with official acts.  *See* Iowa Code § 719.1(1)(a), (b) (2016) (providing that a person commits interference with official acts when the persons knowingly resists or obstructs anyone known by the person to be a peace officer in the performance of an act which is within the scope of the lawful duty or authority, which is a simple misdemeanor.).  Deputy Jacobs's witnessing of Murillo's infraction provided a basis for the lawful continuance of the stop—even if it was not actually Deputy Jacob's reason for continuing the stop. *See Pals*, 805 N.W.2d at 774 (noting federal courts are split on whether a police

officer may stop a vehicle based only on reasonable suspicion of a *completed* misdemeanor but reiterating the well-settled notion that police may pull over a car based on probable cause of an *ongoing* infraction); *see also State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005) ("We base our assessment of a law enforcement officer's conduct on an objective standard. The legality of the search does not depend on the actual motivations of the law enforcement officers involved in the search." (citation omitted)).

Because Deputy Jacobs had a basis to lawfully continue the stop, Murillo's constitutional rights were not violated when the officer approached his vehicle after detaining Feller and asked for Murillo's license, registration, and proof of insurance. *See Coleman*, 890 N.W.2d at 299 ("[I]t is possible when there is a valid ongoing traffic stop officers may properly seek driver's identification, registration, and insurance information.").

Next, we must consider whether Deputy Jacobs had the requisite suspicion to detain Murillo while the officer called for a K-9 unit to conduct an open-air sniff of Murillo's vehicle. Because "a dog sniff that occurs outside a vehicle is not a search under the meaning of the Fourth Amendment," "neither probable cause nor reasonable suspicion must be present to justify it." *Bergmann*, 633 N.W.2d at 333. However, pursuant to *Rodriguez v. United States*, 135 S. Ct. 1609, 1612, 1615 (2015), "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures" "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." "Beyond determining whether to issue a traffic ticket"—or here, a citation for interfering with official acts—"an officer's mission includes

'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 135 S. Ct. at 1615 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* "Lacking the same close connection to roadway safety as the ordinary inquiries, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* "The critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'" *Id.* at 1616.

It is undisputed that calling the K-9 unit and performing the dog sniff "added time" to the stop. Feller was detained at 5:00 p.m., and Deputy Jacobs then approached Murillo in his vehicle and asked for his identification. Only after this initial contact with Murillo was completed did Deputy Jacobs call for the K-9 unit—at 5:11 p.m.—which did not arrive until 5:26 p.m., with the dog sniff apparently occurring a few minutes later. Thus, the question is whether Deputy Jacobs had reasonable suspicion to detain Murillo for the prolonged stop.

Here, after Feller had been detained, Jacobs returned to Murillo's vehicle and asked him for his license, registration, and proof of insurance. According to Deputy Jacobs's testimony, Murillo then told the officer, unprompted, that he did not want him to search his vehicle. Additionally, Murillo reported he did not have his registration card or current insurance information with him. Jacobs noted that Murillo had not checked the center console for the documents and asked him if he intended to do so; Murillo responded that it was locked. It was then that Deputy Jacobs called for the K-9 unit. We must determine if these actions, along with the

others Murillo had already taken since the stop was initiated, provided a basis for reasonable suspicion that allowed Deputy Jacobs to detain Murillo while he called the K-9 unit.

While the State maintains—and the district court found—that Murillo's refusal to give consent to the search of his vehicle before it was even requested was a basis for reasonable suspicion, "neither the invocation of constitutional rights nor the refusal to grant consent to an officer to perform a search can be used alone to support either reasonable suspicion or probable cause." *State v. Kern*, 831 N.W.2d 149, 175 (Iowa 2013); *see also Florida v. Bostick*, 501 U.S. 429, 436 (1991) ("We have consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or a seizure."). Additionally, we do not accept the State's invitation to consider Murillo's invocation of his legitimate privacy right "along with all the other factors" in determining whether reasonable suspicion existed, as such an invitation cannot pass constitutional muster. While the case law denouncing such an approach is clear, we take this opportunity to "emphasize that refusal to consent should not have been considered in determining reasonable suspicion." *United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998). As our supreme court expounded:

> Any other rule would make a mockery of the reasonable suspicion and probable cause requirements, as well as the consent doctrine. These legal principles would be considerably less effective if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary.

We agree. If such a refusal of consent or invocation of constitutional rights could supply officers with the requisite suspicion or cause to conduct a search, then citizens would be exposed to a dangerous catch-22 when officers request consent to conduct a search. If consent is given, the search occurs. If consent is refused, the officer may nevertheless conduct the search pursuant to the probable cause generated by the refusal. This is an unacceptable consequence under our constitutional framework.

*Kern*, 831 N.W.2d at 175–76 (quoting *Hunnicut*, 135 F.3d at 1350).

We are, however, persuaded by the State's argument that Murillo's indication that he was unable to open the locked center console—when a rational inference led Deputy Jacobs to conclude the ignition key would unlock the compartment—considered in conjunction with his association with Feller, a known drug dealer who was found to have drugs on his person at that time, and Murillo's initial refusal to open or unlock the doors, provided a basis for reasonable suspicion there were drugs in Murillo's vehicle. *See State v. Vance*, 790 N.W.2d 775, 781 (Iowa 2010) ("For an investigatory stop to comply with the protections of the Fourth Amendment, the State must prove by a preponderance of the evidence the officer had specific and articulable facts that, taken together with rational inferences from those facts, would lead the officer to reasonably believe criminal activity is afoot."); *see also State v. Lindsey*, 881 N.W.2d 411, 426 (Iowa 2016) (recognizing "'common-sense conclusio[ns] about human behavior' upon which 'practical people'—including government officials—are entitled to rely" (citations omitted)). While it was possible Murillo had another, not unlawful reason for disingenuously claiming he could not unlock the center console, "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v.*

*Wardlow*, 528 U.S. 119, 123 (2000).  Moreover, "reasonable cause may exist to investigate conduct which is subject to a legitimate explanation and turns out to be wholly lawful."  *State v. Richardson*, 501 N.W.2d 495, 497 (Iowa 1993).

Because the officer had a reasonable suspicion Murillo was concealing narcotics in his vehicle, Murillo's constitutional rights were not violated when Deputy Jacobs detained him to call the K-9 unit.  As Murillo has not challenged the constitutionality of the remainder of the stop—including when the officers conducted a warrantless search of the interior of the vehicle after the K-9 unit indicated near the vehicle—we affirm the district court's denial of Murillo's motion to suppress the evidence found in his truck.

**AFFIRMED.**