# Illinois Official Reports

## Appellate Court

---

### *People v. Bujari*, 2020 IL App (3d) 190028

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LORENC BUJARI, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-19-0028 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | January 8, 2020<br><br>February 3, 2020<br>February 3, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Rock Island County, No. 16-CF-648; the Hon. Frank R. Fuhr, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Steven W. Hanna, of Hanna & Rudd, LLC, of Moline, Bruce L. Carmen, of Carmen Law Office, PC, of Cambridge, and Martin Minnella, of Minnella Tramuta & Edwards, of Middlebury, Connecticut, for appellant.<br><br>Dora Villarreal, State's Attorney, of Rock Island (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Presiding Justice Lytton concurred in the judgment and opinion.
Justice Schmidt specially concurred, with opinion.


**OPINION**

¶ 1     After a stipulated bench trial, defendant, Lorenc Bujari, was found guilty of possession with intent to deliver more than 5000 grams of a substance containing cannabis (720 ILCS 550/5(g) (West 2016)). On appeal, defendant argues the trial court erred in denying his motion to suppress because (1) the stop of his vehicle was unconstitutionally prolonged, (2) the officer did not have reasonable, articulable suspicion of criminal activity to justify prolonging the stop, and (3) he was unconstitutionally seized at the time of the dog sniff. We affirm.


¶ 2                                I. BACKGROUND

¶ 3     On July 28, 2016, defendant was charged with cannabis trafficking (*id.* § 5.1(a), (b)). The State subsequently amended the charge to possession with intent to deliver more than 5000 grams of a substance containing cannabis (*id.* § 5(g)), with the State alleging that on July 28, 2016, defendant knowingly brought 5000 or more grams of cannabis into the state of Illinois for the purpose of delivering said cannabis in Illinois or another state, in that defendant came to Illinois with more than 5000 grams of cannabis and planned to deliver the cannabis.


¶ 4                             A. Motion to Suppress

¶ 5     Defendant filed a motion to quash arrest and suppress evidence. At the hearing on defendant's motion, defendant called Officer Andrew Fratzke to testify.


¶ 6                             1. Fratzke's Testimony

¶ 7     Fratzke testified that he was an Illinois State Trooper and a K-9 handler with the Illinois State Police. He had been a trooper for approximately 20 years and a K-9 handler for 16 years. Fratzke was also a Level 3 commercial motor vehicle inspector, as was every trooper that graduated from the Illinois State Police Academy. As a Level 3 inspector, Fratzke could request certain documentation from a truck driver to confirm compliance with various state and federal regulations pertaining to the driver's registration, license, and logbook.

¶ 8     Fratzke further testified that on July 28, 2016, at approximately 10 a.m., defendant was stopped at a weigh station in Rock Island County, Illinois. Fratzke requested that defendant produce certain documentation as part of a Level 3 commercial motor vehicle inspection regarding defendant's semi tractor-trailer truck. During the inspection, Fratzke reviewed defendant's documentation and performed a motor carrier inspection while defendant waited inside the scale station. Fratzke noticed some minor violations but did not document any infractions on the inspection report. The inspection form contained a box labeled "drug search," and Fratzke checked "no" in that box. Fratzke testified that he turned on his squad-car video camera prior to handing defendant back his inspection paperwork.

¶ 9     Fratzke explained that he had completed the inspection form on his computer and that he may have had to print the report from his squad car computer because his computer did not

always work with the scale house printer. Fratzke acknowledged that the inspection was not completed until he handed the inspection report to defendant, and defendant was not free to leave until he received the report. Fratzke believed it was possible that it took him two or three minutes to go to his squad car and come back, especially if he printed the inspection report from his squad car, which he had to do "[m]ost of the time" at that particular weigh station. Sometimes the weigh station house printer worked, and sometimes it did not work. Fratzke could not recall if he started the recording from his squad car before or after the report was printed, but the recording was started prior to Fratzke handing defendant the inspection paperwork. Fratzke testified that he started the recording because he believed defendant was involved in criminal activity, possibly involving narcotics.

¶ 10     Fratzke further testified that he did not speak with Trooper Thulen (the other officer present) when he went to his squad car to start the recording. Fratzke testified that after he turned on the recording equipment in his squad car, he handed the inspection paperwork to defendant, and as he was doing so, he spoke with defendant for a few minutes, informed defendant that he was free to leave, and told defendant that by the time defendant was done putting his documents away Fratzke would be done walking his dog around defendant's truck. Defendant's attorney asked Fratzke whether defendant had "agreed to that," and Fratzke testified that he was not asking defendant's permission to do so but was informing defendant "this is what I am going to do."

¶ 11                                   2. Video

¶ 12     Defendant offered the video recording from Fratzke's squad car into evidence. The video consisted of a recording of the inside of Fratzke's squad car, with audio.

¶ 13     The first 30 seconds of the video was a silent recording of the inside of Fratzke's squad car, and Fratzke's dog could be seen in the back of the squad car. At 00:00:31 seconds, Fratzke appears on the driver's side of his squad car and could be seen reaching inside the squad car to load a CD into a port (00:00:31-00:01:04). At 00:01:05 on the video, Fratzke pressed a button inside the squad car and the audio portion of the video began. Fratzke could then be heard adjusting the microphone as he stood next to the driver's side of the squad car and then shutting the driver's side door (00:01:05-00:01:35). Fratzke could then be heard taking a few steps away from his squad car (00:01:35-00:01:44).

¶ 14     At 00:01:44 on the video, Fratzke stated to defendant, "Alrighty. Driver's license, bills, receipts, that there." At 00:01:51, Fratzke asked, "So, what do you get paid for something like this, is it per mile or do you get paid per load?" Defendant told Fratzke about his pay rates for approximately 1 minute and 10 seconds. At 00:03:03, Fratzke asked, "What do you think you have to make to survive per mile?" Defendant responded, "My calculations, um, $1.82, *** but it's my calculations. Everybody has it's [*sic*] own budget, whatever." At 00:03:22, Fratzke stated, "Alright, this is the inspection form, saying there's no violations on it, so you don't have to do anything with that." At 00:03:33, Fratzke asked defendant if had any questions, and defendant responded that he did not. At 00:03:35, Fratzke stated to defendant:

> "Before you go, like I said, you're free to leave, you got all your paperwork, everything, you can walk out that door. Um, but before you go, I've got a canine with me. Can I walk my canine around your truck?"

¶ 15     The following conversation took place:

"[DEFENDANT]: Come on man, let me go. You'll waste a lot of my time.

[FRATZKE]: Not really, it takes less than a minute.

[DEFENDANT]: What can I tell you? What am I? I am nobody to stop anybody.

[FRATZKE]: Is there any reason why the dog would alert to the odor of narcotic in your truck? Like an odor of a drug?

[DEFENDANT]: Come and check it.

[FRATZKE]: Yeah?

[DEFENDANT]: Like I said, I'm, I'm just late.

[FRATZKE]: I'm not wanting to put the dog inside, I just want to walk the dog around the outside, so? It takes, it takes me about less than a minute. See, I would have already had the dog done by now.

[DEFENDANT]: So, why did you tell me anything then? You're the boss.

[FRATZKE]: Well, I just want to make sure you understand what I'm asking. Right?

[DEFENDANT]: So don't ask me, because you're the boss.

[FRATZKE]: I have to ask you.

[Defendant]: You're the boss. What do I know?

[FRATZKE]: Okay. While you're getting loaded up, how about I walk the dog while you're getting everything in line and filling out your logbook and everything like that. How's that sound?

[DEFENDANT]: Uh, actually.

[FRATZKE]: And you'll be, you'll be outta here by the time I'll be done.

[DEFENDANT]: It's, it's your call.

[FRATZKE]: Okay.

[DEFENDANT]: You're the boss.

[FRATZKE]: Yeah?

[OFFICER THULEN]: Is it okay with you, though?

[UNIDENTIFIABLE]: As long as it's O—

[DEFENDANT]: You are the boss.

[FRATZKE]: No, but what I'm saying though is, that you understand what I'm asking, that it's okay that while you're getting your stuff ready—

[DEFENDANT]: I was going to try to go, um.

[FRATZKE]: I would have had it done by now.

[UNIDENTIFIABLE]: [Laughing.]

[FRATZKE]: Here's what, here's what I'd like to do. While you're getting your stuff in order, while you're putting your stuff away, I'd like to walk the dog around. And then you'll be on your way. Okay?

[OFFICER THULEN]: It takes about a minute.

[FRATZKE]: Yep.

[DEFENDANT]: Your call."

¶ 16    The above conversation concluded at 00:05:02, when defendant informed Fratzke that it was Fratzke's "call" on whether to walk the dog around the truck. Following that conversation, from 00:05:11 to 00:05:17, defendant could be seen on the video walking past the rear of Fratzke's squad car, unescorted, holding paperwork in his hand. From 00:05:17 to 00:05:36, Fratzke could be seen on the video retrieving his canine from the squad car.

¶ 17    After retrieving the canine from the squad car, Fratzke could not be seen on the video but could be heard making sounds (presumably directing the canine around the defendant's vehicle). At 00:05:57, Fratzke stated that defendant has his "door open and is getting in his truck." At 00:06:18, Fratzke stated, "alert on the back." At 00:06:23, Fratzke stated, "canine alert on the rear of the vehicle." At 00:06:35, Fratzke states, "wanting to pull away, pulling me back again." At 00:07:03, Fratzke stated, "o.k., she's like locked up on the back." At 00:07:21, Fratzke stated, "pulling me back to the rear again; locked up *** on the taillight on the rear of the trailer on the driver's side." Fratzke then noted, "Driver was still getting his paperwork ready before he was driving away." Defendant was handcuffed by Thulen, and Fratzke recited defendant his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶ 18                    3. Fratzke's Cross Examination and Redirect Examination

¶ 19    On cross-examination, Fratzke testified that he was trained and qualified to conduct Level 3 inspections of commercial vehicles, which were mandated to ensure commercial motor vehicle operations in the State of Illinois conform to state and federal guidelines. Fratzke testified that most Level 3 inspections took between 30 to 60 minutes to complete.

¶ 20    On the morning in question, Fratzke had completed a commercial motor vehicle report regarding defendant's Level 3 inspection on the standard form used by the Illinois State Police. Fratzke began the inspection at 10:00 a.m. and finished filling out the inspection form on his computer at 10:42 a.m. Fratzke testified that he began recording the end of the inspection because he was suspicious that defendant was involved in some type of criminal activity, possibly narcotics.

¶ 21    Fratzke testified that he could be heard on the video handing the inspection documents to defendant and, at that time, defendant was free to go and there was nothing that would have prevented defendant from leaving. After Fratzke had informed defendant that he was free to go, defendant left the scale station house, and Fratzke left the scale station out of a separate door. Fratzke never brandished his weapon, never physically placed his hands-on defendant, never chased after defendant or yelled for him to stop, and never forced defendant to stop. Defendant got into his truck, and Fratzke did not stop defendant from doing so.

¶ 22    Fratzke testified that through his work as a state trooper, he was familiar with how semi-tractor trailers operated and it would take a driver of a semi-tractor trailer truck a minute or two of preparation before being able to drive away. Fratzke also testified that as he walked the canine around defendant's vehicle, defendant's driver-side door was still open and defendant was never in the position to leave. Fratzke only walked his canine around defendant's truck once because the canine alerted on the first pass. Fratzke testified that even though defendant was free to go, defendant "was not ready to go" at the time of the dog sniff. Fratzke testified that his canine alerted to the back of defendant's truck in less than 30 seconds, which was consistent with the dog's ability to detect a large presence of drugs (775 pounds of cannabis in this case).

¶ 23    Fratzke further testified that when conducting a Level 3 inspection, the inspector looks at the driver's license and documentation, including the driver's logbooks (to ensure compliance with daily hour restrictions) and the bill of lading (to ensure the "bill of ladings are what they say is in the trailer" and "to match up with the logbooks"). When inspecting defendant's documents in this case, Fratzke found that it was "abnormal" that defendant had multiple days of downtime in California. He also noted a discrepancy between defendant's logbook times and the time defendant had indicated regarding his last pick up. Fratzke testified that it appeared that defendant was attempting to hide his downtime, whereas discrepancies in logbooks were generally found when drivers attempted to hide excessive driving time, not downtime.

¶ 24    Fratzke also testified that drivers did not place their own seal on a load, which defendant had done in this case. Seals were typically placed on the back of a trailer by the company giving the load to the driver to ensure there was no tampering with the load. Defendant had placed his own seal on the load, the seal number was handwritten, and there was a padlock placed on the back of the trailer. Fratzke testified that typically a driver would have documentation indicating a seal was issued by the company, but defendant did not have any such documentation. Fratzke testified that if defendant was attempting to simply keep the load secure, he could have just used the padlock alone to secure the load. Fratzke also noted that the padlock had been placed on the left door, which Fratzke testified did no good on the left door because the right door could always be opened. Fratzke indicated, "You can't open the left without the right being open. So, the padlock should have been on the right door at that time, along with the seal if he was going to have a legit seal." Fratzke also testified that defendant had indicated the seal had been given to him by a friend.

¶ 25    After Fratzke's canine alerted, defendant's trailer was searched. The inside of defendant's trailer contained 18 Home Depot boxes containing 775 pounds of cannabis. Defendant was then arrested.

### 4. Ruling on Motion to Quash Arrest and Suppress Evidence

¶ 26

¶ 27    On November 8, 2017, the trial court entered a written order denying the defendant's motion to quash arrest and suppress evidence. The trial court found (1) the Level 3 inspection had taken place from 10 a.m. until 10:42 a.m.; (2) "[a]t the same time that the officer was providing the Defendant with his inspection documents, he started the videotape in his squad car," which was parked outside the weigh station; (3) Fratzke's canine was in Fratzke's squad car; (4) upon completion of the inspection, Fratzke requested defendant's consent for Fratzke to perform a dog sniff around defendant's trailer, and defendant neither consented nor denied Fratzke permission to do so; (5) Fratzke allowed defendant to leave the weigh station scale house and proceed to his truck; (6) at approximately 10:42 a.m., while defendant was preparing to exit the parking lot of the weigh station, Fratzke walked his canine around the sides and rear of the vehicle, at which point the canine alerted at approximately 10:46 a.m.; (7) defendant was not seized at the time the canine alerted; (8) the stop was not unconstitutionally prolonged to allow Fratzke to obtain his canine where, at all times during the duration of the stop, Fratzke's canine was present; and (9) as defendant entered his vehicle and prepared to leave, the driver-side door to his truck cab was still open when Fratzke's canine alerted.

¶ 28    The trial court also found that Fratzke had developed a reasonable, articulable suspicion during the Level 3 inspection to justify further investigation. The trial court indicated:

"The fact that this Defendant placed a private seal on the load that was not required, and had his own personal padlock on the rear doors which was on the wrong side and, in fact, did not provide security for the load, would raise the suspicion of any reasonable experienced officer. Discrepancies within the driver's logbook further supported this suspicion."

¶ 29 The trial court denied defendant's motion to suppress. Defendant filed a motion to reconsider, and after a hearing on the motion, the trial court took the motion under advisement. There was no indication in the record of an order disposing of defendant's motion to reconsider, but defendant stated in his brief on appeal that "the circuit court issued a summary denial [of his motion to reconsider] on May 4, 2018."

¶ 30                                B. Stipulated Bench Trial

¶ 31 On October 11, 2018, a stipulated bench trial took place, after which the trial court found defendant guilty. Defendant was sentenced to six years of imprisonment and three years of mandatory supervised release.

¶ 32 Defendant appealed.

¶ 33                                    II. ANALYSIS

¶ 34 On appeal, defendant argues that the trial court erred in denying his motion to quash arrest and suppress evidence because Fratzke unconstitutionally prolonged the Level 3 inspection; Fratzke did not have reasonable, articulable suspicion of criminal activity to justify prolonging the Level 3 inspection; and defendant was seized at the time Fratzke's canine alerted to the presence of drugs in defendant's vehicle. The State argues that the trial court correctly found that Fratzke did not unconstitutionally prolong the encounter with defendant, Fratzke had a reasonable suspicion to justify further investigation during the Level 3 inspection, and defendant was not seized as a matter of law at the time of the dog sniff.

¶ 35 In reviewing a trial court's ruling on a motion to suppress evidence, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Cregan*, 2014 IL 113600, ¶ 22.

¶ 36 The trial court's ultimate legal ruling on whether the evidence should be suppressed, however, is reviewed *de novo*. *Id.*

¶ 37 "A defendant aggrieved by an unlawful search and seizure may move the court *** to suppress as evidence anything so obtained on the ground that *** [t]he search and seizure without a warrant was illegal[.]" 725 ILCS 5/114-12(a)(1) (West 2016). On a motion to suppress evidence, the defendant has the burden of proving that the search and seizure were unlawful. *Id.* § 114-12(b); *Cregan*, 2014 IL 113600, ¶ 23.

¶ 38 Both the fourth amendment of the United States Constitution and article I, section 6, of the Illinois Constitution of 1970 protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV (providing, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated"); Ill. Const. 1970, art. I, § 6 (providing, "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures"). The fundamental purpose of these provisions is to safeguard the privacy and security of individuals from invasions by governmental officials. *People v. Dilworth*, 169 Ill. 2d 195, 201 (1996).

¶ 39    "[A] person has been seized when, considering the totality of the circumstances, a reasonable person would believe he was not free to leave." *People v. Oliver*, 236 Ill. 2d 448, 456 (2010) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). The detention by police of an individual during a traffic stop is a seizure within the meaning of the fourth amendment. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008); *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). " '[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.' " *People v. Harris*, 228 Ill. 2d 222, 235 (2008) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).

¶ 40    The "tolerable duration" of police inquires in the traffic-stop context is determined by the seizure's " 'mission.' " *Rodriguez v. United States*, 575 U.S. ___, ___ , 135 S. Ct. 1609, 1614 (2015) (quoting *Caballes*, 543 U.S. at 407). The mission of a traffic stop includes " 'ordinary inquiries incident to [the traffic] stop,' " which typically involve checking the driver's license, determining whether there are outstanding warrants against the driver, and examining the vehicle's registration and proof of insurance. *Id.* at ___, 135 S. Ct. at 1615 (quoting *Caballes*, 543 U.S. at 408). These ordinary inquires incident to a traffic stop serve the same objective of ensuring vehicles on the road are being operated safely and responsibly, as does enforcement of the traffic code. *Id.* at ___, 135 S. Ct. at 1615.

¶ 41    Authority for the seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." (Internal quotation marks omitted.) *Id.* at ___, 135 S. Ct. at 1618. A seizure remains lawful only if any unrelated inquiries " 'do not measurably extend the duration of the stop.' " *Id.* at ___, 135 S. Ct. at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). An officer may conduct certain unrelated checks during an otherwise lawful traffic stop but may not do so in a way that would prolong the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at ___, 135 S. Ct. at 1615.

¶ 42    Here, defendant raises no issue as to the lawfulness of Fratzke and Thulen initiating the Level 3 inspection. In light of the diminished expectation of privacy in commercial property used in closely regulated industries, "the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search [citation], have lessened application in this context." *New York v. Burger*, 482 U.S. 691, 702 (1987). Where such privacy interests within the operations of closely regulated industries are weakened, the government's interest in regulating particular businesses are heightened so that a warrantless inspection may be reasonable within the meaning of the fourth amendment. *Id.* Pursuant to the Illinois Motor Carrier Safety Regulations contained in the Illinois Administrative Code, "[t]he Illinois State Police are authorized to enter upon and perform commercial vehicle inspections (as defined in 92 Ill. Adm. Code 390.1020) of motor carrier vehicles in operation." 92 Ill. Adm. Code 396.2010(a) (2013). A Level 3 inspection is defined in section 390.1020 of the Illinois Administrative Code as follows:

> "Level 3 - Driver/Credential Inspection: An examination that includes those items specified under the North American Standard Level 3 Driver/Credential Inspection Procedure. At a minimum, Level 3 inspections must include, when required and/or applicable, examination of the driver's license; medical examiner's certificate and Skill Performance Evaluation (SPE) Certificate; driver's record of duty status; hours of service; seat belt; vehicle inspection report; and HM/DG requirements. Those items not indicated in the North American Standard Level 3 Driver/Credential Inspection

- 8 -

Procedure shall not be included on a Level 3 inspection." 92 Ill. Adm. Code 390.1020 (2016).

¶ 43       Defendant concedes that "[t]here is no dispute that the state troopers conducted the Level 3 Driver/Credential inspection pursuant to their authority under 92 Ill. Adm. Code, § 395.1020 [*sic*], which serves the same objective as enforcement of the traffic code: ensuring that commercial vehicles on the road are operated safely and responsibly." Defendant contends, however, that Fratzke did not have a "reasonable, articulable suspicion" of criminal activity to prolong the Level 3 inspection to go to his squad car to turn on the vehicle's recording equipment, to ask defendant questions about the rate of pay he was earning for the load he was carrying, or to perform the dog sniff. Specifically, defendant contends that the traffic stop for the Level 3 commercial vehicle inspection started at approximately 10 a.m. and concluded at 10:42 a.m.—the ending time indicated on the inspection report—and any acts by the state troopers after 10:42 a.m. became unlawful because those acts prolonged the stop beyond the time reasonably required to complete the mission of the Level 3 inspection. Defendant argues that Fratzke's questions regarding defendant's pay were "outside the scope, at that juncture, of the completed Level 3 inquiry." Defendant also argued that the trial court erred in finding that Fratzke had developed reasonable, articulable suspicion of criminal activity to prolong the traffic stop and in finding defendant was not seized at the time Fratzke's canine alerted.

¶ 44       First, we disagree with defendant that Fratzke did not have reasonable, articulable suspicion of criminal activity to prolong the stop. Fratzke's testified that he was a certified and experienced Level 3 inspector and he thought it was abnormal for defendant to place an unnecessary private seal on his load, place a padlock on the wrong door so that the load was not secure, and have a logbook with discrepancies that suggested an attempt to hide "down time." Thus, our review of the record indicates the trial court did not err in finding that Fratzke developed a reasonable, articulable suspicion of criminal activity during the Level 3 inspection to warrant further investigation. Consequently, Fratzke did not unconstitutionally prolong the Level 3 inspection by the 90 seconds that it took him to ask defendant two questions about defendant's rate of pay for the load that he was carrying across the country and then listening to defendant's responses. See *Johnson*, 555 U.S. at 333 (police may ask questions aimed at uncovering other criminal conduct during a valid stop).

¶ 45       Additionally, Fratzke did not unreasonably prolong the stop by turning on the video and audio recording equipment in his squad car. Section 30 of the Illinois State Police Act directs Illinois State Police officers assigned to a patrol vehicle with in-car video recording equipment to record activities outside their patrol vehicle whenever the officer conducts an enforcement stop, activates the emergency lights, or "reasonably believes recording may assist with prosecution, enhance safety, or for any other lawful purpose." 20 ILCS 2610/30(c) (West 2016). An "enforcement stop" is defined under the Illinois State Police Act as "an action by an officer of the Department in relation to enforcement and investigation duties, including but not limited to, traffic stops, pedestrian stops, abandoned vehicle contacts, motorist assists, commercial motor vehicle stops, roadside safety checks, requests for identification, or responses to requests for emergency assistance." *Id.* § 30(a). Contrary to defendant's contention, Fratzke had a reasonable, articulable suspicion of criminal activity, so it would have been reasonable for him to believe that any further interaction with defendant "may" be of assistance with a potential prosecution. Additionally, Fratzke was conducting an "enforcement stop"—an action in relation to his enforcement and investigation duties. See *id.*

- 9 -

Thus, considering the directives of section 30 of the Illinois State Police Act, the Level 3 inspection was not unreasonably prolonged by the time it took Fratzke to start the recording equipment before he further interacted with defendant.

¶ 46    In this case, Fratzke terminated the Level 3 inspection encounter with defendant by explaining the inspection report, confirming that defendant had all his paperwork, and informing defendant that he was free to leave. Generally, a traffic stop ends when the paperwork of the driver and any passengers is returned to them and the purpose of the stop has been resolved. *People v. Leach*, 2011 IL App (4th) 100542, ¶ 12 (citing *Cosby*, 231 Ill. 2d at 276 (the request for consent took place after the officers returned the defendants their paperwork, at which point the traffic stop had come to an end)). The record shows that Fratzke returned defendant's paperwork and then requested consent to perform a dog sniff around defendant's vehicle. At the time Fratzke made the request, defendant was no longer seized and, therefore, Fratzke did not prolong the Level 3 inspection by making the request.

¶ 47    Although in response to Fratzke's request to perform the dog sniff, defendant told Fratzke "come and check" and indicated that it was Fratzke's "call" as to whether to perform the dog sniff, the issue of whether defendant had consented to the dog sniff need not be decided in this case because the defendant was not seized at the time Fratzke made the request. Once a seizure is concluded and the defendant is free to discontinue his encounter with the police, a defendant's voluntary consent to be searched may be obtained unless he is unlawfully seized anew. *Cosby*, 231 Ill. 2d. at 276 (the relevant question is whether the officers' actions after the initial traffic stop has concluded constituted a second seizure). When determining whether a challenged encounter was consensual, the United States Supreme Court has indicated that "a person is seized within the meaning of the fourth amendment 'only when, by means of physical force or a show of authority, his freedom of movement is restrained.' " *People v. Almond*, 2015 IL 113817, ¶ 57 (quoting *Mendenhall*, 446 U.S. at 553). "[A] person has been seized when, considering the totality of the circumstances, a reasonable person would believe he is not free to leave." *Id.* The following factors have been identified by the United States Supreme Court in *Mendenhall* to indicate whether a person has been seized: (1) the threatening presence of several police officers, (2) the display of a weapon by an officer, (3) some physical touching of the person, or (4) the use of a tone of voice or language compelling the individual to comply with the officer's requests. *Id.* (citing *Oliver*, 236 Ill. 2d at 456, citing *Mendenhall*, 446 U.S. at 554). These factors are not exhaustive, and coercive police actions that are similar to the *Mendenhall* factors may also constitute a seizure. *People v. Luedemann*, 222 Ill. 2d 530, 557 (2006). Nonetheless, the absence of any of the *Mendenhall* factors "is highly instructive" in determining whether a seizure occurred. *Id.* at 554.

¶ 48    In this case, Fratzke's testimony and the video of his encounter with defendant show that defendant was not seized at the time Fratzke requested consent to perform the dog sniff or at the time Fratzke performed the dog sniff and the dog alerted. Fratzke had terminated the Level 3 inspection by returning defendant's paperwork so that defendant was free to leave. See *Cosby*, 231 Ill. 2d at 276. Defendant then walked out of the weigh station scale house unescorted and went to his truck, with his documents in hand. There is no indication in the record that either Fratzke or Thulen exhibited a "threatening" presence, displayed their weapons, physically touched defendant, or spoke to defendant in any manner after he left the weigh station scale house. Defendant concedes that none of the *Mendenhall* factors were present in this case. Having considered the *Mendenhall* factors, as well as the totality of the

- 10 -

circumstances, we conclude that the initial seizure of defendant (the Level 3 inspection) had terminated after Fratzke returned defendant's documentation and told defendant he was free to leave.

¶ 49 Additionally, we conclude that the fourth amendment does not apply to the subsequent dog sniff in this case. We acknowledge that police must have reasonable suspicion to justify *detaining* someone for the purpose of performing a dog sniff. See *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615; *Caballes*, 543 U.S. at 407-08 (the use of a drug dog and the subsequent discovery of contraband are the product of an unconstitutional seizure if the dog sniff is conducted while respondent was unlawfully detained). However, police officers do not need independent reasonable articulable suspicion of drug-related activity to perform a dog sniff because a dog sniff is not, in itself, either a search or a seizure within the meaning of the fourth amendment. *Harris*, 228 Ill. 2d at 242; *Caballes*, 543 U.S. at 409-10 (a dog sniff of the exterior of a car at a traffic stop does not implicate privacy interests). Since defendant was not seized at the time of the dog sniff, there was no fourth amendment implication involved.

¶ 50 In support of his argument that the Level 3 inspection was unconstitutionally prolonged by the dog sniff, defendant cites to *People v. Pulling*, 2015 IL App (3d) 140516. In *Pulling*, the evidence showed that Fratzke in that case had possessed the requisite information to complete the traffic stop within four minutes of its initiation but, without a reasonable suspicion to do so, Fratzke asked the driver to sit with him in his squad car and questioned the driver while he wrote a speeding ticket. *Id.* ¶¶ 5-6. Eight minutes into the stop, Fratzke exited his squad car, went to the passenger window of the driver's vehicle, and questioned the defendant. *Id.* ¶ 7. Five minutes later, Fratzke performed a free-air sniff with his canine. *Id.* ¶ 8. In *Pulling*, this court held that Fratzke unlawfully prolonged the duration of the stop when he stopped preparing the citation to conduct the dog sniff without a reasonable, articulable suspicion of criminal activity. *Id.* ¶ 15. Here, unlike in *Pulling*, the dog sniff was conducted after defendant was no longer seized and was free to leave. Because Fratzke had terminated the seizure of defendant (the Level 3 inspection) and there was no subsequent seizure anew prior to the dog alert, the dog sniff could not have prolonged the Level 3 inspection.

¶ 51 In his brief on appeal, defendant suggests that he was not free to leave at the time of the dog sniff because he speculates that if he had driven away at the time Fratzke was walking the canine around defendant's truck, "the officers would have pursued him for endangering Trooper Fratzke and his K-9." However, there was no evidence presented indicating that if defendant had driven away he would have, in fact, endangered Fratzke or the canine so that he had no choice but to remain in place. We disagree with defendant's contention that Fratzke momentarily passing in front of, or walking beside, his vehicle, in and of itself, constituted a seizure where there was no evidence that defendant was prepared to leave or was attempting to leave but was prevented from doing so in any way. Therefore, defendant has not met his burden of proving that he was seized at the time of the dog sniff, and the trial court did not err in denying his motion to quash arrest and suppress evidence.

## III. CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Rock Island County is affirmed.

Affirmed.

JUSTICE SCHMIDT, specially concurring:

While I concur with the majority, I write separately to point out that it does not matter whether defendant was seized at the time of the dog sniff. The trial court found, and we agreed, that the trooper had developed reasonable, articulable suspicion of criminal activity to warrant further investigation. *Supra* ¶ 44. This reasonable, articulable suspicion warranted the three minutes that it took the trooper to run the dog around the truck after the conclusion of the Level 3 inspection. I should note that it remains a mystery to me as to why the trooper did not simply run the dog around the truck without asking for consent.

Both in his brief and at oral argument, defendant relied heavily on *Rodriguez*, 575 U.S. ___, 135 S. Ct. 1609. This case is nothing like *Rodriguez*. Here, even if defendant was seized at the time of the dog sniff, the trooper's reasonable, articulable suspicion of criminal activity supports the additional three-minute detention under *Terry v. Ohio*, 392 U.S. 1 (1968).