**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180593-U

Order filed September 23, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0593 Circuit No. 16-CF-347 |
| | ) | |
| KEVIN R. CONARD, | ) ) | Honorable Jeffrey W. O'Connor, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1        *Held*:   The circuit court did not err in denying defendant's motion to suppress.

¶ 2        Illinois State Trooper Sean Veryzer executed a traffic stop after observing a vehicle

following a semi-truck and trailer (semi) too closely (625 ILCS 5/11-710 (West 2016)). During

the stop, troopers discovered cannabis and cannabis infused products inside the trunk of the

vehicle. The State charged defendant, Kevin R. Conard, with unlawful possession of more than

500 grams but not more than 2000 grams of a substance containing cannabis with intent to deliver

(720 ILCS 550/5(e) (West 2016)) and unlawful possession of cannabis (*id.* § 550/4(e)). Defendant filed a motion to suppress evidence, arguing that Veryzer conducted the stop absent probable cause and unduly prolonged the mission of the stop by engaging in drug interdiction activities. The circuit court denied the motion, subsequently finding defendant guilty. The court sentenced defendant to 30 months of probation. Defendant appeals the denial of the motion to suppress. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On October 12, 2016, Veryzer sat in his squad car in the median of Interstate 80 perpendicular to the roadway, observing eastbound traffic. In a kennel in the back of the squad car was his canine Roman. Approximately 2½ miles before Veryzer's location, the interstate opened to two lanes as it was reduced to one lane beforehand for road construction.

¶ 5        Veryzer observed a semi followed by a sedan that in turn was tailed by another semi, all traveling in the right-hand lane. Aside from those vehicles, no other traffic was in the vicinity. The vehicles were coming down a slight decline in the road. The left-hand lane was empty and open. Veryzer used a stopwatch and a fixed spot on a guardrail on the opposite side of the interstate to time the interval between the initial semi and the sedan. The sedan was less than 1½ seconds behind the semi. Based on his experience and training, Veryzer testified that an appropriate following interval at 65 miles per hour would be three seconds. Veryzer initiated a traffic stop on the sedan for following the semi too closely (625 ILCS 5/11-710 (West 2016)).

¶ 6        The dashboard camera (dash cam) footage of the stop and the audio from the microphone Veryzer wore on his person captured the alleged violation described above as well as the following. Once the sedan came to a stop, Veryzer approached the passenger side of the vehicle and observed defendant and a passenger, Joshua Ringer, sitting in the front of the vehicle. At just beyond the three-minute mark of the dash cam video, Veryzer made contact with the occupants. Veryzer asked

defendant if the vehicle belonged to him. Defendant stated the vehicle was a rental. Veryzer secured the driver's license of both occupants as well as the rental agreement. He then inquired which of the occupants rented the vehicle and whether defendant still resided at the address listed on the license. Veryzer then asked defendant if he knew why he had been pulled over, followed by an explanation that defendant was following the semi in front of him too closely. Veryzer explained that he was going to write defendant a warning and requested defendant accompany him to the squad car. Veryzer conducted a quick waist pat down to check for weapons and instructed defendant to enter the squad car on the front passenger side.

¶ 7      Upon entering the car, defendant asked Veryzer, "How's your day going so far?" Veryzer responded, "It's pretty early yet" and asked defendant where he was coming from. Defendant responded, "San Diego," and explained that his passenger picked up the rental car in Las Vegas. Veryzer asked defendant how he got from San Diego to Las Vegas. Defendant began explaining that Ringer, who used to be his roommate, had flown out there to "rendezvous" and that Ringer now lives in Indiana. At this point, the stop had endured for just under three minutes from the time of first contact.

¶ 8      Veryzer reiterated his understanding of the travel arrangements when defendant interrupted him, explaining that defendant's family lives in Indiana. Reviewing the rental agreement, Veryzer stated, "boy that's a pretty cheap rental for a one-way rental—$225. Wow." Dispatch informed Veryzer that the rental vehicle was "clear." Veryzer asked defendant for clarification about where he lived; defendant stated he still lived in California. Veryzer asked defendant how long he planned to be in Indiana. Defendant responded, "Oh, yeah—yeah. Just, just for like a—a few days, like— see my, uh, family and everything, so." Veryzer asked if defendant planned to drive back. Defendant stated that he planned to fly back adding that they were going to be dropping the car off

in South Bend. Attempting to pronounce the name of a town while reading from either Ringer's driver's license or the rental agreement, Veryzer stated that he was unfamiliar with "Mish—Mish-a-waka."

¶ 9       At just under four minutes into the stop, Veryzer called for backup. Dispatch responded followed by a trooper stating that he was en route. The sound of Veryzer typing can be heard for the next several seconds while he continued reviewing the rental agreement, noting the vehicle was rented on "the ninth." Another few seconds elapsed during which the sound of Veryzer typing along with dings and clicks from his computer can be heard. Defendant asked Veryzer to again explain the correct following distance between vehicles which he did. Five minutes into the stop, Veryzer radioed dispatch to provide the license information for defendant and his passenger. He then asked defendant how long he and the passenger had known each other. Defendant stated that they went to college together and worked together at a pizza place.

¶ 10       At just over the six-minute mark, Veryzer asked if he could walk Roman around defendant's vehicle. Defendant consented. Seconds later, dispatch stated defendant was clear for warrants but could not confirm the status of his driver's license because "California is slow." Veryzer, while performing functions on his computer, then commented to defendant, "usually you get a one-way rental they charge the heck out of you because they're not gonna get the vehicle back, but—maybe they need some cars in Indiana." Veryzer then asked defendant if there was anything "good" in the trunk of the vehicle. Defendant responded, "nope." Veryzer and defendant discussed Ringer's flight to Las Vegas and clarified the particulars of their trip.

¶ 11       At just past the seven-minute mark, backup arrived on the scene. Veryzer exited the squad car and spoke with Trooper Beau Marlow, explaining the travel arrangements he had gleaned from defendant. Veryzer asked Marlow to go speak with Ringer about the travel arrangements. Marlow

- 4 -

then asked Veryzer if he wanted Trooper Justin Lankford to work on the warning. Veryzer responded that he would have Lankford complete the warning if needed.

¶ 12    Veryzer returned to his vehicle and continued working on the warning while defendant asked him questions about the road construction. Nine minutes into the stop, Veryzer asked dispatch for the time the stop commenced. The sounds of Veryzer typing and reciting information as he typed can be heard before Veryzer commented to Lankford that he "hates" the new locate function because "it takes forever," requiring him to flip "back and forth." He stated that it was faster to fill out warnings before when they were handwritten. Veryzer asked defendant if there was any chance that Roman would alert to narcotics if he walked around the vehicle. Defendant responded, "um, yes" and, after a brief pause, added that he had a medical marijuana card from California. Veryzer stated there was "nothing illegal about that as long as you are in your state, and you leave it in your state."

¶ 13    Lankford began working on the remainder of the warning while Veryzer walked Roman over to defendant's vehicle. At eleven minutes and thirty-two seconds into the stop, Roman alerted on the vehicle and the troopers located 1484 grams of cannabis and cannabis infused products inside the trunk. The troopers placed defendant under arrest.

¶ 14    Just shy of 27 minutes after Veryzer first made contact while en route to the Geneseo Police Department, dispatch came across the radio confirming defendant's California driver's license was valid.

¶ 15    Defendant was charged by information with unlawful possession of more than 500 grams but less than 2000 grams of a substance containing cannabis with intent to deliver (720 ILCS 550/5(e) (West 2016)) and the lesser-included offense of unlawful possession of cannabis (*id.* § 550/4(e)). Defendant filed a motion to suppress evidence, alleging Veryzer conducted the stop

absent probable cause and unduly prolonged the mission of the stop by engaging in drug interdiction activities. The circuit court held a hearing where the dash cam video and audio from the stop were submitted into evidence. Veryzer and Lankford also testified.

¶ 16          Veryzer's testimony conformed to the dash cam video and audio recording. He did not use a radar gun to obtain the speed of defendant's vehicle but, instead, estimated it was going anywhere from 65 to 70 miles per hour. From his observations, he was able to estimate that there were two car lengths, or approximately 24 feet in between the back of the semi and the front of defendant's vehicle. Using his wristwatch and a fixed point directly across from the squad car, Veryzer was able to determine defendant's vehicle was traveling approximately 1½ seconds behind the semi. He found this to be an unsafe and imprudent distance based on his training and experience. At highway speeds, the recommended time between vehicles is three seconds. At 65 miles per hour, a vehicle will travel roughly 96 feet per second. Based on his training and experience, specifically basic traffic crash investigation training, it takes approximately 1½ seconds for an individual to react to a hazard in the roadway. That reaction time coupled with a speed of 65 miles per hour means that an individual will travel 144 feet before being able to react to a hazard. An interval of three seconds between vehicles gives an individual 288 feet to react to a hazard in the road. Veryzer did not mention the Illinois Rules of the Road manual promulgated by the secretary of state during his testimony.

¶ 17          Between the time that he and defendant entered the squad car, he called in names, birth dates, and driver's license to dispatch to get a warrant check. He also started up the "TRAKS" program, reviewed both licenses, the rental agreement, and conversed with defendant about his license and the details of the trip. Veryzer then ran defendant and Ringer through the Law Enforcement Automated Data System (LEADS). He radioed for backup because he wanted to walk

Roman around defendant's sedan based on certain "commonalities" associated with drug trafficking. These commonalities included the nervousness of defendant and the odd travel arrangements.

¶ 18    The Illinois State Police no longer issue handwritten warnings, instead, everything is computerized. When asked whether he had all the information necessary to complete the warning, Veryzer stated he did not due to the fact defendant's license had not come back as valid. He explained that if defendant's license came back as suspended, he would then write a citation for driving while suspended as well as a citation for driving too closely. If he would have gone ahead and started the warning before verification of the validity of defendant's license, he would then have to go through a voiding process before starting the citations. Given that process, he did not immediately start the warning as it is customary to wait until the license comes back as valid.

¶ 19    Nonetheless, he did begin working on the warning. He radioed dispatch requesting the time he initiated the stop and then entered it into the warning form. Veryzer completed the warning up to a certain point so he could hand it off to Lankford without explanation. When asked directly whether he did anything to prolong the stop while waiting for backup, Veryzer stated he did not, and that backup arrived "maybe five minutes into the stop." Veryzer estimated it took 15 to 22 minutes per traffic stop with the new system to complete a stop. He believed it was "11 or 12 minutes into the traffic stop" when he conducted the free-air sniff on defendant's vehicle with Roman.

¶ 20    Lankford testified that he arrived on the scene with Marlow. He approached the driver-side door of Veryzer's squad car and could see Veryzer working on the warning. Veryzer had a discussion with Marlow about the defendant and Ringer's travel arrangements and then asked Lankford to finish the warning while he took Roman to defendant's vehicle. Lankford used the

information from the LEADS search Veryzer previously conducted to continue filling out the warning. He testified one of the licenses had not returned as valid but that he could complete the warning without that verification. However, the traffic stop would not conclude without verification the license was valid. He was unable to finish the warning before the cannabis was discovered and defendant was handcuffed.

¶ 21    The court denied the motion to suppress, finding that Veryzer "had a basis to stop the car for following too closely and the stop was not unreasonably prolonged." Ultimately, the circuit court found defendant guilty and sentenced him to 30 months' probation. Defendant failed to file a posttrial motion preserving the arguments presented during the motion to suppress.

¶ 22    Defendant appeals.

¶ 23                                    II. ANALYSIS

¶ 24    Defendant argues the circuit court erred in denying his motion to suppress evidence. He contends the traffic stop was based on Veryzer's inaccurate understanding of the following too closely statute. Defendant also asserts that the stop was unduly prolonged due to Veryzer's drug interdiction activities that distracted from completing a warning for a moving violation, which was the mission of the stop. The State argues the traffic stop was justified based on the observations and methods used by Veryzer. The State also argues that while the mission of the stop was to issue a warning citation, it did not preclude Veryzer from completing ordinary inquiries incident to the stop, *i.e.*, validating defendant's license.

¶ 25    We apply a mixed standard of review in examining a ruling on a motion to suppress evidence. *People v. Grant*, 2013 IL 112734, ¶ 12. We afford great deference to the circuit court's findings of fact, reversing those findings only if they are against the manifest weight of the evidence. *Id.* However, we review *de novo* the lower court's ultimate ruling. *Id.*

¶ 26       At the outset, we note that the State argues defendant's procedural forfeiture of the issues raised on appeal must be honored as he failed to file a posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 187 (1988) (finding that to preserve an issue for review, a party must raise the issue at trial and in a written posttrial motion). Defendant, in turn, argues that both the constitutional exception to forfeiture and plain error apply allowing us to review the matter. We disagree with the assertion that the constitutional exception to forfeiture applies in this instance.

¶ 27       In *People v. Cregan*, 2014 IL 113600, ¶¶ 15-18, our supreme court opined that the constitutional exception to forfeiture in essence advances the interests of judicial economy, allowing the appellate court to address an issue on direct appeal rather than requiring that the defendant raise the issue in a separate postconviction petition. Citing to *Enoch*, the *Cregan* court reiterated that three types of claims are not subject to forfeiture for failing to file a posttrial motion. *Id.*¶ 16. Among them, "constitutional issues that were properly raised at trial *and* may be raised later in a postconviction petition." (Emphasis added.) *Id.* This notion does not apply here where postconviction relief is not available to defendant as he has completed his term of probation. See *People v. Thurman*, 334 Ill. App. 3d 286, 289 (2002) ("Postconviction review is not available to those who have already completed their sentences and might simply wish to purge their records of past convictions."). Instead, plain-error review is appropriate on these facts.

¶ 28       The plain-error rule allows a reviewing court to consider unpreserved claims of error where either

>          " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness

- 9 -

of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Gaines*, 2020 IL 125165, ¶ 18 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

The first step in plain-error review is to determine whether an error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The burden of persuasion in plain-error review is on the defendant. *Gaines*, 2020 IL 125165, ¶ 18.

¶ 29                                  A. Propriety of the Traffic Stop

¶ 30        Defendant first argues that Veryzer did not observe a violation of the following too closely statute but, instead, observed defendant violate Veryzer's own perception of the statute based on the Illinois Rules of the Road manual. "Both the federal and state constitutions protect citizens from unreasonable searches and seizures." *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 20 (citing U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States,* 517 U.S. 806, 809-10 (1996). Ergo, vehicle stops are subject to the fourth amendment's reasonableness requirement and a decision to stop an automobile will generally be reasonable where police have probable cause to believe that a traffic violation has occurred.[1] *People v. Hackett*, 2012 IL 111781, ¶ 20 (citing *Whren*, 517 U.S. at 810 and *People v. McDonough*, 239 Ill. 2d 260, 267 (2010)).

---

[1] Although not relevant here, we must note that probable cause is not required to commence a traffic stop, as the less exacting standard of reasonable articulable suspicion that justifies a *Terry* stop will suffice for purposes of the fourth amendment. See *Hackett*, 2012 IL 111781, ¶ 20; *People v. Close*, 238 Ill. 2d 497, 505 (2010). We do not apply that standard here as the trooper had probable cause to stop defendant's vehicle for a traffic violation.

¶ 31          Section 11-710 of the Vehicle Code (Code) (625 ILCS 5/11-710 (West 2016)) states that, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway."

¶ 32          The statute does not provide a specific spatial standard or method of calculation to determine whether a violation has occurred. Based on his training and experience, Veryzer stated it takes approximately 1½ seconds for a driver to observe a hazard and engage in defensive driving maneuvers. During this delay in realizing an imminent hazard, a vehicle moving at a speed of 65 miles per hour will travel 144 feet. Based on the same training, the recommended interval between vehicles is 3 seconds when vehicles are traveling at 65 miles per hour. Veryzer used a fix point on a guardrail across from him and a stopwatch to determine the interval between defendant's vehicle and the semi. According to Veryzer's unrebutted testimony, the approximately 1½ seconds interval between defendant's vehicle and the semi did not allow for defensive driving maneuvers in the case of a hazard on the roadway. Veryzer's calculation supports a reasonable belief that defendant committed a traffic violation. See *People v. Jones*, 215 Ill. 2d 261, 273-74 (2005).

¶ 33          Defendant's argument that Veryzer actually stopped him for a violation of the Illinois Rules of the Road and not the actual statute is without merit. Veryzer never stated that his belief of a prudent and reasonable distance between cars was based on the Illinois Rules of Road guidelines, instead, only his training and experience. More to the point, his training from basic traffic crash investigation. The only mention of the Illinois Rules of the Road came from defense counsel during closing arguments. Veryzer clearly explained his reasoning for the stop and the methods by which he came to his conclusion.

¶ 34      Even if Veryzer's reliance was based on the directives contained in the Illinois Rules of the Road, defendant fails to advance, and our research fails to produce, authority finding such reliance reversible error. As the State points out, there is only case law upholding such reliance. See *People v. Wofford*, 2012 IL App (5th) 100138, ¶ 26; *United States v. Lewis*, 920 F.3d 483, 489-90 (7th Cir. 2019).

¶ 35      Defendant further contends he was being prudent and reasonable in his following distance of the initial semi as he was "pinned" between two semis, could not increase his following distance of the lead semi without closing the distance between himself and the trailing semi, and could not enter the left lane absent the risk of being stopped for driving in the passing lane without passing. We find the argument that defendant was driving prudently and reasonably under the circumstances without merit. For all his complaints about the semi behind his vehicle following him too closely, defendant could have simply moved into the left lane as the dash cam video shows and unrebutted testimony established that no other traffic was in the vicinity of the three vehicles. See 625 ILCS 5/11-701(e)(1) (West 2016) (stating the prohibition against driving in the left lane without passing "does not apply *** when no other vehicle is directly behind the vehicle in the left lane").

¶ 36      Veryzer reasonably believed a moving violation occurred under the Code. Defendant failed to offer any evidence that rebutted Veryzer's assertions thereby failing to carry his burden at the suppression hearing. Accordingly, the circuit court did not err. As no error occurred, there can be no plain error.

¶ 37                            B. Duration of the Traffic Stop

¶ 38      Next, we review whether Veryzer unlawfully prolonged the stop. Defendant contends that Veryzer's immediate detour into a drug interdiction investigation violated his rights under the

federal and state constitutions. He also alleges that absent Veryzer's unconstitutional detours from the mission of the stop, he could have completed the ordinary inquiries incident thereto within the stated average time for issuing warnings.

¶ 39 Even when supported by probable cause, an initially lawful seizure " 'can become unlawful if it is prolonged beyond the time reasonably required' to complete the purpose of the seizure." *Reedy*, 2015 IL App (3d) 130955, ¶ 27 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). In the traffic-stop context, the tolerable duration of the stop is "determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, [citation] and attend to related safety concerns[.]" *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (citing *Caballes*, 543 U.S. at 407). These related safety concerns also referred to as "ordinary inquiries incident to [the traffic] stop," typically include checking the validity of the driver's license, determining whether there are any outstanding warrants against the occupants of the vehicle, checking the driver's criminal history, and inspecting the vehicle's registration and proof of insurance. *Caballes*, 543 U.S. at 408; *People v. Cummings*, 2016 IL 115769, ¶¶ 13, 17. These ordinary inquiries serve a dual objective, officer safety and " 'ensuring that vehicles on the road are operated safely and responsibly.' " *People v. Sanchez*, 2021 IL App (3d) 170410, ¶ 28 (quoting *Rodriguez*, 575 U.S. at 355).

¶ 40 "A seizure remains lawful only if any unrelated inquiries do not measurably extend the duration of the stop." (Internal quotation marks omitted.) *People v. Bujari*, 2020 IL App (3d) 190028, ¶ 41 (quoting *Rodriguez*, 575 U.S. at 354), quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). "Authority for the seizure ends 'when tasks tied to the traffic infraction are—or reasonably should have been—completed.' " *Id.* (quoting *Rodriguez*, 575 U.S. at 354). We analyze

the duration of a traffic stop by the totality of the circumstances considering the brevity of the stop and whether law enforcement acted diligently. *People v. Pulido*, 2017 IL App (3d) 150215, ¶ 39.

¶ 41 Defendant primarily relies on *Rodriguez*. To be frank, this case in no way resembles *Rodriguez*. There, the officer had completed the purpose of the stop, issued a written warning, and returned documents to the defendant at the 22-minute mark of the stop, only then asking for permission to conduct a free-air sniff. *Rodriguez*, 575 U.S. at 352. The defendant declined the officer's request at which point the officer again detained the defendant, waiting another five minutes for a canine to arrive. *Id.* The officer clearly prolonged the stop as he had completed the mission of the stop and was no longer pursuing tasks related to the mission. *Id.* at 357-58.

¶ 42 The traffic stop in this case was not unlawfully prolonged beyond the time reasonably required to complete the seizure's mission. This court in *Sanchez*, 2021 IL App (3d) 170410, recently addressed arguments similar to those defendant advances. Relevant in *Sanchez*, was the review of *People v. Heritsch*, 2017 IL App (2d) 151157, and *People v. Reedy*, 2015 IL App (3d) 130955, with both finding that " '[i]f drugs are detected at a time when the officer would otherwise still have been writing a ticket, we fail to see how, at that point, any time has been added to the stop.' " *Sanchez*, 2021 IL App (3d) 170410, ¶ 32 (quoting *Heritsch*, 2017 IL App (2d) 151157, ¶ 13); *Reedy*, 2015 IL App (3d) 130955, ¶ 32. The *Sanchez* court continued its analysis explaining there must be evidence establishing that but for the activities unrelated to the traffic stop, the stop would have completed before the dog alerted to the presence of contraband. *Id.* The court went on to hold that even if the questioning of the defendant was unrelated to the mission of the stop, asking those questions is not unlawful as long as it does not extend the time the defendant was detained. *Id.* (citing *Reedy*, 2015 IL App (3d) 130955, ¶ 32, citing *Muehler v. Mena*, 544 U.S. 93, 101 (2005)); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). That same logic applies here.

¶ 43   In the approximately 11 minutes before Roman conducted the free-air sniff, Veryzer diligently pursued the mission of the stop. He reviewed all the documentation he received from the occupants of the vehicle, including the rental agreement. He started the TRAKS program required to complete the warning and waited for it to "boot up" while he conducted a LEADS search of defendant and Ringer as well as called their license information into dispatch. He also called in the information of the rental car to dispatch.

¶ 44   None of the questions asked by Veryzer unreasonably extended the time defendant was detained. While performing inquiries incident to the stop, Veryzer asked several questions while answering a few posed to him. Nonetheless, it is apparent from the video and audio that Veryzer was still pursuing ordinary inquiries incident to the stop. Veryzer explained that his hesitation in starting the warning was due to the fact he did not have verification that defendant's driver's license was valid. If the license came back as invalid, he would have to void the warning and start a new citation. Both Veryzer and Lankford testified that the stop would not conclude until dispatch validated defendant's license.

¶ 45   When returning Ringer's license as valid, dispatch commented that the State of California was "slow" in returning defendant's license check. Defendant contends that "Without Trooper Veryzer's unconstitutional detours from the mission of his stop, he could have completed the ordinary checks noted in *Rodriguez* within his average window for issuing warnings." Defendant continues, alleging that "Perhaps knowing this, Veryzer waited 65 seconds from the moment he called for backup and received an immediate response before calling in the driver's license details." These contentions are belied by the fact that dispatch was unable to report the validity of defendant's license for almost 22 minutes. These assertions advanced by defendant appear spurious when considering he consented to a free-air sniff at the six-minute mark of the stop and

drugs were discovered at just over the 11 minute mark. Even if Veryzer called the license into dispatch immediately after receiving it while standing at defendant's vehicle, the drugs would have still been discovered before the license was validated.

¶ 46    We fail to see how the traffic stop was unduly prolonged when drugs were detected at a time when the trooper was completing an ordinary inquiry incident to the traffic stop. See *People v. Cummings*, 2016 IL 115769, ¶ 15 (citing *Rodriguez*, 575 U.S. at 355) ("Ordinary inquiries incident to the stop do not prolong the stop beyond its original mission, because those inquiries are a part of that mission.") There is no evidence in the record indicating that but for Veryzer's questions, the warning or ordinary inquiries would have been completed before the alert by Roman. *Reedy*, 2015 IL App (3d) 130955, ¶ 38. The questions asked of defendant did not extend the time he was detained.

¶ 47    In his reply brief, defendant narrows his focus of the complained of activities on the part of Veryzer to contend that calling for backup at the four-minute mark of the stop unreasonably prolonged the stop and was not related to the mission of issuing a warning citation. Just as we reasoned above, we fail to see how calling for backup prolonged the stop when the trooper was completing ordinary inquiries incident thereto.[2] Moreover, the trooper's decision to call for backup was a "negligibly burdensome precautio[n]" for officer safety as "[t]raffic stops are 'especially fraught with danger to police officers[.]' " (Internal quotation marks omitted.) *Rodriguez*, 575 U.S. at 356 (quoting *Johnson,* 555 U.S., at 330); *Utah v. Strieff*, 579 U.S. ___, 136 S. Ct. 2056, 2063 (2016). As Justice Alito explained in his dissent in *Rodriguez*,

---

[2] Defendant also argues "The fact that Veryzer can be heard punching keys on his keyboard throughout the questioning is not indicative of anything in particular." We disagree. Veryzer's unrebutted testimony establishes that during that time, he was running searches on the occupants of the vehicle while also starting up the program required to process the warning.

"When occupants of a vehicle who know that their vehicle contains a large amount of illegal drugs see that a drug-sniffing dog has alerted for the presence of drugs, they will almost certainly realize that the police will then proceed to search the vehicle, discover the drugs, and make arrests. Thus, it is reasonable for an officer to believe that an alert will increase the risk that the occupants of the vehicle will attempt to flee or perhaps even attack the officer." *Rodriguez*, 575 U.S. at 371 (Alito, J., dissenting).

¶ 48     Defendant consented to the free-air sniff at approximately the six-minute mark of the stop, rendering the argument concerning Veryzer's call for backup trivial. Given defendant's consent, the sniff on the vehicle was an inevitability.[3] Whether Veryzer called for backup at the six- minute mark, or the four-minute mark is immaterial as he was tending to the mission of the stop. Further, there was no evidence that but for the call for backup, the warning would have been completed and delivered before Roman detected the presence of contraband. *Reedy*, 2015 IL App (3d) 130955, ¶ 38.

¶ 49     None of the activities engaged in by Veryzer unduly prolonged the stop. As above, where no error occurred, there can be no plain error.

¶ 50     Accordingly, the lower court properly denied defendant's motion to suppress.

¶ 51                              III. CONCLUSION

¶ 52     For the foregoing reasons, we affirm the judgment of the circuit court of Henry County.

¶ 53     Affirmed.

---

[3] We note that consent is not required for a free air-sniff by a canine as it does not violate a reasonable expectation of privacy. *Caballes*, 543 U.S. at 408-09.